[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Cornelia B. (a/k/a Michelle) age 10, was adjudicated to have been a neglected and uncared for child pursuant to Conn. Gen. Stat. 46b-129(d) on 5/9/88 and was committed to the Department of Children and Youth Services (DCYS). She was placed with relatives for the first seven months, and on 12/5/88 with licensed foster parents, with whom she has lived with for the past twenty eight months.
The mother's parental rights were terminated 6/20/90 after having signed a voluntary consent. On 8/23/90 DCYS filed a petition to terminate the parental rights of the respondent father, Venancio B. He was served by certified mail in Puerto CT Page 85 Rico and appeared in this court with his attorney on 2/19/91. The case was continued to 4/15/91 when he appeared to oppose the petition at trial.
Pursuant to Sec. 17a112 C.G.S. (formerly C.G.S. 17-43a) DCYS alleged three grounds for termination.
 (1) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child.
 (2) the child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral, or emotional well-being.
 3) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child.
 DCYS must prove at least one of these grounds by clear and convincing evidence; which must have existed for at least one year, unless waived under (c) of Sec. 17a, 112, C.G.S.
By statutory definition, termination of parental rights means "the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent or parents so that the child is free for adoption. . . ." Sec. 5a-707(g) C.G.S. It is a most serious and sensitive judicial action. In re Juvenile Appeal (Anonymous) 181 Conn. 638, 640, 436 A.2d 290 (1980). "Although that ultimate interference by the state in the parent child relationship may be required under certain circumstances, the natural rights of parents in their children "undeniably warrants deference and, absent a powerful countervailing interest, protection.'" In re Juvenile Appeal (Anonymous),177 Conn. 648, 671, 420 A.2d 875 (1979).
A petition to terminate parental rights consists of two phases, adjudicatory and dispositive. Practice Book Sections 1049, 1042, 1044. The two phases however, do not have to be the subjects of separate hearings. One unified trial, such as occurred in this case, is permissible. In re Juvenile CT Page 86 Appeal (84-AB), 192 Conn. 254, 259 (1984). Although the procedure of one trial is permitted, the two phases serve distinct purposes.
In the adjudicatory phase, the court determines the validity of the grounds in the petition and, hence is limited to events preceding the filing date of the petition, in this case August 23, 1990.
The dispositive phase is concerned with what action should be taken in the best interest of the child and, as to it, the court is entitled to extend its consideration to matters occurring until the end of the trial which in this case was April 15, 1991. The dispositive phase, of course, cannot furnish a subject for decision unless the adjudicatory phase is proven first.
ADJUDICATION: On facts as to when petition was filed or amended: (8-23-90).
At the trial on April 15, 1991, the court heard testimony from Ms. Barbara Hatch, Social Worker, DCYS, and entered into evidence her mandated social study dated 8/13/90. Her treatment plan dated 6/1/90 amended 1/12/91 is a part of the file. A psychological evaluation of this child was prepared by Dr. Ralph S. Welsh dated 2/17/88. The only two other witnesses who testified were the foster mother, and the respondent father.
Based upon the respondent's own testimony, the court finds that he had lived in Danbury with the mother, Elizabeth L. in 1979, and that this child was born on 10/22/80. They were never married. There are also two other children born to this mother by different fathers, Gabriel N. born 2/21/79, and Sheyla C., born 11/27/83. The respondent provided limited support to Cornelia prior to his departure from Danbury for Puerto Rico in 1984 where he remained and returned only after receiving notice of this petition in September, 1990. His only explanation for leaving Danbury was that he was out of work. During this six year absence, he claimed that he sent some money for Cornelia's support, but could not prove it. From 1988 to the date of trial, he was working full time as a janitor in a school in Puerto Rico, but no support payments were made. The respondent defends this action with the claim that he did not have the mothers address in Danbury. But he knew his child was in a Danbury school and called there twice in 1988. However, he was not allowed to speak with his child because no one at the school knew him. He did not write to the school to advise them that he was the father and made no other efforts to locate her. CT Page 87
The respondent also introduced into evidence a photograph of Cornelia sent to him by the mother on 4/18/87 and a telephone bill dated 2/25/88, almost a year later, that showed the two calls to the child's school in Danbury. He also claimed to have paid one-half of an air fare for the child to come to Puerto Rico in 1986. Except for these three attempts, from 1984 to Feb. 1988, there was no contact between father and child from 1984 until September, 1990. The respondent provided no financial support for Cornelia for over six years. He has met none of the other needs of this child; during this entire period she was always supported by the state of Connecticut.
On 5/9/88 this child was adjudicated neglected and uncared for because the mother was convicted on a drug charge and sent to Niantic prison. Initially this child and her two siblings were placed in the custody of an aunt and uncle by DCYS. On 12/5/88, they were placed with the licensed foster parents, with whom they are still residing. These facts are confirmed in the mandated home study, the psychological evaluation, and the DCYS treatment plan.
Abandonment, the first ground in this petition, is defined in Sec. 17a-112(b) C.G.S. as the failure "to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child" for more than one year unless the court waives this time requirement under (c) of this statute.
The Supreme Court decision in re Juvenile, (Docket No., 9489), 183 Conn. 11 (1981) sustained a termination on this ground of statutory abandonment and discussed five minimum attributes of parenthood: (1) Express love and affection for the child, (2) express personal concern as to the health, education and general well being of the child (3) the duty to supply the necessary food, clothing, and medical care, (4) the duty to provide an adequate domicile and (5) the duty to furnish social and religious guidance. The finding of abandonment focuses on the parents conduct. In re Juvenile, 183 Conn. supra at page 14.
From the finding of facts in this matter, and from the respondent's conduct, he manifested no reasonable degree of interest, concern or responsibility for his child's welfare. He had no contact with her whatsoever from 1988 to 9/90. The record supports by clear and convincing evidence, the abandonment of this child under Sec. 17a-112 (1) of the Conn. Gen. Statutes.
The second and third grounds involve the absence of care, CT Page 88 guidance or control necessary for the child's welfare (2nd ground), and (3rd) that there is an no on going parent-child relationship that develops from a parent meeting with the child on a day to day basis.
The same findings of facts, together with the record for the abandonment ground, are applicable to these additional two charges, and the court so finds. His six year absence made it impossible to establish the "relationship that ordinarily develops as a result of a parent having met on a day to day basis, the physical, emotional, moral and educational needs of the child." He failed to provide any of these basic needs. Although absence alone is not a ground for termination of his rights, these circumstances, together with his testimony that he has no plan to provide a home or support of any kind for her, compel the conclusion that "to allow further time for the establishment . . . of the parent-child relationship would be detrimental to the best interest of the child."
Cornelia lived the first seven years of her life with a drug addicted mother, whose incarceration resulted in placement with DCYS. This agency placed her with relatives for a few months and then in a licensed foster home for the past 28 months. In his psychological evaluation of Cornelia, (2-17-88), Dr. Welsh concluded that this child needs a supportive, predictable environment. He also stated that the child's bold assertive facade"is obviously an attempt to gain control of an environment that she found threatening and totally lacking in security." This need for such a supportive environment is all the more critical for this child now after years of turmoil and deprivation. Therefore, this Court finds, by clear and convincing proof, both of the two additional grounds pleaded for the termination of the respondents parental rights, have been met by DCYS.
DISPOSITION; on facts as of 4/15/91 (date of trial).
In the dispositive phase of a termination proceeding, the court shall consider all evidence and matters occurring from the date of commitment to DCYS (5/9/88) until the end of the trial on 4/15/91. The mandated social study and the treatment plan for this child are a part of the record and were available to counsel in accordance with Sec. 1044 of the Practice Book.
In this phase, the court is concerned with what action should be taken in the best interest of the child. The court must determine by clear and convincing evidence that the parental acts or deficiencies found in the adjudicatory phase support the conclusion that this respondent parent cannot have or CT Page 89 should not exercise, in the best interest of the child, any further parental rights and duties. In re Juvenile Appeal, 192 Conn. 254. (1984).
The respondent returned to Danbury only after receiving the termination petition in Puerto Rico in September 1990. To the date of trial, he had four DCYS supervised visits with the child at the home of the foster parents. By his own admission at the trial he has no plan to establish a permanent home for her, nor did he make any offer of any financial support for her. In fact, at trial he agreed to an additional eighteen (18) month extension of commitment as requested by DCYS, hardly an indication that he wanted to assume any parental duties or responsibilities. Considering his almost total lack of interest in his daughter's welfare since 1984 when he went back to Puerto Rico, and the fact that he has given no indication of any plan to return to Danbury to care for Cornelia, it is totally unrealistic to think that this established pattern of behavior toward the child will change in the future. While he expressed a love for his child at trial, his abandonment and disregard for her welfare prove the opposite. In contrast, the testimony of the foster parent, confirms that the child has made significant progress emotionally and in her behavior during the past twenty eight months. She has become an "A" student in school and feels secure emotionally living with her brother and sister in the foster parent's household where a strong parental bond has been developed. These foster parents wish to adopt her and the other two children. Since the best interest of the child is paramount here, the availability and suitability of adoptive parents is clearly relevant. In re Juvenile, 181 Conn. page 646 (1980)
But, before the Court may terminate his parental rights, it must also consider the six factors and make written findings regarding them under Sec. 17a-112 (d) C.G.S.
(1.) DCYS could not offer services to a parent whose whereabouts were unknown for over six years. When the respondent returned from Puerto Rico, DCYS did arranged supervised visits with the child. The respondent never offered any plan to provide a home or financial support for his child since contact with him had been made.
(2.) No court orders or expectations could be imposed because he never contacted DCYS to inform them of his whereabouts. The two telephone calls to the school are a clear indication that he knew his daughter was in Danbury; however he made no other effort to locate her, inquire about her welfare, or communicate in any manner with her. CT Page 90
(3.) Cornelia told Dr. Ralph S. Welsh during the psychological evaluation on 2/17/88 that her father was in Puerto Rico where he was born, however she was born in Danbury. She further advised that he never spanked her but gave her money to buy things. Dr. Welsh felt that these remarks were based not on reality, but the child's imagination. He further found her to feel threatened by her past environment but was protective of her mother who was in jail. She wanted a secure, stable and protective environment, which neither the father or mother ever provided her with, nor has the respondent any plan to provide same in the foreseeable future.
On the other hand, the mandated social study and treatment plan prepared by DCYS, indicates that Cornelia during the past twenty eight months in the home of the foster parents, has developed strong, positive and emotional ties to them. The foster parents are attentive to her needs and they wish to adopt Cornelia, her brother and sister. DCYS has recommended said adoption.
(4.) Cornelia is now ten years old. The DCYS Treatment plan of 6/1/90 and 11/28/90 confirm that she has made significant progress in school. Her physical and emotional needs have been met while living with her foster parents who are nurturing, caring people. Knowing that she will continue to live in this safe, stable and permanent home will give this child the optimum opportunity to maximize her potential.
(5.) The respondent made minimal efforts to maintain contact with the child while he was in Puerto Rico for the past six years. He did not provide financial support, even after obtaining a full time job. He knew she was in Danbury in 1988 but made no attempt to contact her. This inactivity on behalf of his child, indicates that his child's welfare was not a priority with him. He has not now, nor has he in the past, adjusted his circumstances, conduct or living conditions in any manner that would indicate that it was in Cornelia's best interest to return to her father's care and custody now, or in the foreseeable future.
(6.) He was not prevented by the mother or any other person from maintaining a meaningful relationship with his daughter. The only reason he gave at the trial for this lack of contact was that he lost her address. The response to this excuse is addressed in the preceding five paragraphs.
Having considered the foregoing six (6) factors, it is both clear and convincing that Cornelia's best interest will only CT Page 91 be served if the respondent father's parental rights are terminated so that she may be placed in the security of adoption without further delay.
Therefore it is ORDERED that the parental rights of the respondent father be and hereby are terminated and it is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing said child in adoption. DCYS is required to submit reports to the clerk of this Court within ninety (90) days of the judgment and every six (6) months thereafter until such adoption is finalized.
Entered in Danbury, Connecticut, this 29th day of April, 1991
Petroni, J.